OPINION
Plaintiffs-employees Carlo Agostinelli, et al. and defendants DeBartolo Realty Corp., et al. filed cross-appeals from a judgment rendered by the Mahoning County Common Pleas Court upon remand from this court. For the following reasons, the judgment of the trial court is affirmed in part, reversed in part and remanded. Specifically, the decisions of the trial court which were appealed in the employees' first and fourth assignments of error are reversed and remanded for trial; all other assignments of error are without merit and are overruled.
 STATEMENT OF FACTS
In 1994, DeBartolo Realty Corp. ("DeBartolo") created a stock incentive plan to reward and retain certain key employees and to attract additional employees. Under the incentive plan, which was to be administered by the Compensation Committee of DeBartolo's Board of Directors, chosen employees were allocated the opportunity to earn a varying number of shares of DeBartolo's common stock, which had recently become publicly traded. These employees would earn the allocated shares when DeBartolo met its annual "funds from operations" goals. Specifically, if DeBartolo met an annual goal, each employee would earn a predetermined percentage of his or her original allocation of shares. Once the employee earned this percentage of the shares, a staggered vesting period then operated, whereby a percentage of the earned shares would be issued and vest immediately and a percentage would be subject to deferred vesting throughout a three-year period after the date the shares were earned. If an annual goal was not met, the percentage of shares available for earning that year could be earned in a subsequent year if cumulative goals were reached.
In the plan's first year of implementation, DeBartolo realized its performance goal. As such, all participants earned 10% of the stock available under their respective original allocations. As outlined above, a percentage of the earned shares was immediately issued and the remainder was subject to the three-year vesting period. The 1995 goal was not met; therefore, the employees earned no shares for that year. In March 1996, DeBartolo entered into an Agreement and Plan of Merger with Simon Property Group (hereinafter collectively referred to as "the corporation"). A formal change in control occurred in August of that year.
As a result of this change, Carlo Agostinelli, along with a number of additional employees, requested that the corporation deliver all remaining shares originally allocated under the plan along with any dividends declared up to the point of merger. The employees' understanding was that pursuant to certain provisions of the plan, each employee's original allocation of stock was to immediately vest upon a change in control of the corporation. The corporation refused to deliver the remaining shares to the employees as they contended that the plan only called for accelerated vesting of those shares that were earned after accomplishment of the 1994 annual financial goal but were not yet vested.
Due to these differing positions, a complaint was filed on behalf of various employees. The employees alleged that the corporation's failure to deliver all of the shares originally allocated to each employee constituted breach of contract and breach of the covenant of good faith and fair dealing. The corporation filed an answer and two counterclaims. The employees filed a motion for summary judgment on the issues of the corporation's liability and damages. The corporation filed a cross-motion for summary judgment on the issue of its liability to the employees on the remaining allocated shares. The corporation also sought summary judgment on its counterclaims.
The trial court overruled the employees' motion for summary judgment and sustained the corporation's cross-motion for summary judgment on the issue of liability. The trial court determined that the employees were not entitled to the shares that had been allocated but not earned. The trial court then stated that because the corporation received summary judgment on the issue of its liability for the remaining allocated shares, its counterclaims were moot.
The employees appealed the trial court's decision to this court. This court concluded that pursuant to the clear and unambiguous language of the plan, after the change in control, the employees were entitled to vesting of all shares originally allocated by the committee regardless of whether they had been earned. Agostinelli v. DeBartolo Realty Corp. (Aug. 18, 1999), Mahoning App. No. 97CA227, unreported. We thus reversed the summary judgment entered in favor of the corporation and, instead, we entered summary judgment for the employees. We then remanded after instructing the trial court to address the corporation's counterclaims and to calculate the amount of damages to which the employees were entitled.
On remand, the corporation's motion for summary judgment on its counterclaims was first addressed by the magistrate. The first counterclaim complained that thirteen employees who were terminated upon the merger received severance benefits but failed to sign a release of claims. The corporation contended that the failure to sign a release violated the terms of the severance program and the employees should thus return payments and stock received under the severance program. The magistrate determined that the severance program allowed the corporation to require employees to sign a release of claims in order to receive benefits, but that this option could not be exercised after the benefits are already paid. Upon the corporation's objections, the trial court affirmed the decision of the magistrate granting summary judgment to the employees on the corporation's first counterclaim.
The second counterclaim was filed against two employees and alleged that the severance program placed a cap on the amount of benefits a departing employee could receive. The corporation argued that if these two employees received the allocations sought under the stock incentive plan, the combined amount they would be paid under the incentive plan and the severance program would exceed the cap. The corporation thus claimed that, with regards to the amount the cap was exceeded, the court should set off the amount already paid under the severance program against any amount to be awarded under the incentive plan. The magistrate and subsequently the trial court agreed with the corporation and found that the amount paid under the severance program should be set off against the amount that these two employees would be paid under the incentive plan. Therefore, summary judgment was entered for the corporation on its second counterclaim.
The magistrate was then to consider the issue of damages. However, the magistrate became ill and subsequently passed away. As a result, on December 14, 2000, the trial court held a status conference at which it was determined that the court would review the filings that the magistrate had been considering and decide whether summary judgment should be entered on the amount of damages or whether the case should be heard. (Tr. 18). On December 27, 2000, the trial court issued summary judgment on the amount of damages. The court noted that the change in control took place on August 6, 1996 and that the market value of the stock at that time was $16.575 per share. It thus awarded each employee a sum equal to their respective number of remaining allocated shares multiplied by the share value as of that date. It also awarded each employee prejudgment interest from the date of the merger in the amount of ten percent per annum. Both the corporation and the employees appealed the trial court's decision.
 EMPLOYEES' FIRST ASSIGNMENT OF ERROR, CASE NO. 01CA09
The employees allege four assignments of error on appeal,[1] the first of which alleges:
 "THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO APPLY THE PLAIN MEANING OF THE CONTRACT IN NOT AWARDING DAMAGES TO PLAINTIFFS FOR PRE-MERGER DIVIDENDS THAT WERE DECLARED BY DEBARTOLO REALTY CORP. AFTER THE GRANTING OF THE STOCK AWARDS AND PRIOR TO THE MERGER WITH SIMON."
There is no dispute that between the time at which DeBartolo allocated shares under the incentive plan and the date of the merger, DeBartolo declared dividends in the amount of $2.915 per share. The employees argue that Section 6(b)(ii) of the plan clearly demonstrates that they are entitled to these pre-merger dividends. That section provides:
 "Unless otherwise determined by the Committee at grant, amounts equal to any dividends declared during the Deferral Period with respect to the number of shares covered by a Deferred Stock Award will be paid to the participant currently, or deferred and deemed to be reinvested in additional Deferred Stock, or otherwise reinvested, all as determined at or after the time of the Award by the Committee."
We note that pursuant to our prior decision in this case, the deferred stock awards include the allocated but unearned shares.
The employees note that the award letters they received upon allocation of the shares make no mention of any decision by the committee not to pay dividends on the shares covered by the awards as it could have under the above provision. Thus, they claim that they are entitled to premerger dividends as a matter of law under the plain language of the incentive plan.
The corporation counters by claiming that the committee did "otherwise determine at grant" that dividends would not be payable on shares that were not earned, vested and issued. In support of this contention, the corporation submitted the affidavits of two members of the committee who stated that in June 1994, the committee determined that participants in the plan would not be entitled to dividends that were declared before the shares were issued. The affidavits stated that support for their claims could be found in the minutes of the committee meeting. In rebuttal, the employees attached the minutes of this meeting to their memorandum in support of summary judgment and argued that the minutes did not support the statements in the corporations' affidavits.
In reviewing the minutes, it can be gleaned that the incentive plan was adopted and 2.6 million shares were granted for use under the plan. An exhibit attached to and referred to in the minutes sets the annual funds from operation goals. Another exhibit attached to and referred to in the minutes is entitled, "Guidelines for Incentive Stock Plan" and appears to set forth methods for calculating each annual funds from operation number. The relevant portion of this document which is quoted in the committee members' affidavits, provides as follows:
 "Shares `issued' under the plan will be included in the computation. Shares not issued (or not vested) are excluded since the dividend(s) are not distributable pursuant to such plan."
From this, the corporation argues it is clear that the committee determined at the time of the grant that dividends declared on DeBartolo stock would not be payable on any shares covered under the incentive plan unless those shares were issued, i.e. after they vested. To the contrary, the employees argue that the reference to dividends is obscure and taken out of context. They also contend that the above passage, especially the word "distributable," only establishes that the participants would not actually receive the declared dividends until vesting.
 ANALYSIS
Initially, we must point out that the trial court's decision on this issue was to be either a grant or a denial of the employees' motion for summary judgment. The employees' 1997 motion originally sought summary judgment on liability and damages. When this court granted summary judgment to the employees on liability and remanded for consideration of damages, the portion of their motion for summary judgment dealing with the issue of damages remained outstanding. However, because the corporation's cross-motion for summary judgment was on the issue of liability alone, it obviously did not survive when this court overruled that motion, found liability, and entered judgment for the employees. (The corporation's only summary judgment motion that survived was the one regarding their counterclaims.) Accordingly, contrary to what the corporation seems to argue, the employees were the movants, and the corporation was the nonmovant on the issue of damage calculation in general and on the issue of premerger dividends in particular.
There was no trial on damages; the trial court heard no evidence on remand. The court stated it would take the matter under advisement and render a decision unless it determined that a hearing was necessary. (12/14/00 Tr. 18). Thus, in order to render its decision disposing of the case on December 27, 2000, the trial court must have found that it could proceed to judgment as a matter of law as there were no genuine issues of material fact. As per the typical summary judgment analysis, this court must review the trial court's decision de novo. Nationwide Mutual FireIns. Co. v. Guman Bros. Farm (1995), 73 Ohio St.3d 107, 108. The analysis does not change merely because the issue before the court was that of damages rather than both liability and damages.
In seeking summary judgment, the movant has the initial burden to identify the portions of the record that demonstrate the absence of a genuine issue for trial. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. The portions of the record that may be viewed at this point are pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact. Civ.R. 56(C). The burden then shifts to the nonmovant to demonstrate that there exists a genuine issue of material fact. Dresher,75 Ohio St.3d at 293. The nonmovant may not rest on its pleadings alone but must set forth a genuine issue for trial by affidavit or otherwise. Civ.R. 56(E). Courts must contemplate awarding summary judgment with caution since it may not be granted unless reasonable minds can only come to a conclusion that is adverse to the nonmovant. Civ.R. 56(C). If the court finds that some material facts exist without controversy and some are actually controverted, it should specify what relief or damages are not in controversy and proceed to hear the remaining issues. See Civ.R. 56(D). (The above analysis is applicable to all assignments of error as each part of the decision appealed is the result of a summary judgment entered by the trial court.)
As aforementioned, the parties do not dispute that Section 6(b)(ii) of the incentive plan generally requires dividends to be paid on the deferred stock award, either currently or reinvested in stock or elsewhere. The parties also do not dispute that Section 6(b)(ii) contains an exception to payment of dividends on shares that are under deferral and that this exception requires the committee to determine at grant that dividends will not be paid. The genuine issue of material fact lies in whether the committee determined at grant that dividends would never be credited to shares that were unvested.
The corporation argues that, after it set forth affidavits claiming that the committee made the determination under the exception in Section 6(b)(ii), the employees had a reciprocal burden to set forth evidence in rebuttal. However, as we previously stated, the employees were the movants, and the corporation was the nonmovant. By setting forth affidavits, the corporation met any arising reciprocal burden to establish a genuine issue of material fact. Thus, the court was correct in denying the employees' motion for summary judgment on the issue of premerger dividends; however, summary judgment should not have been granted to the corporation as a genuine issue remained. The court is not free to review affidavits submitted by the nonmovant, determine they are credible, and render judgment, without trial, in favor of this nonmovant. See Turner v. Turner (1993), 67 Ohio St.3d 337, 341 (stating that a court acts contrary to Civ.R. 56(C) when it determines the credibility of the evidence proffered regarding summary judgment). See, also, Bowen v. Kil-Kare, Inc. (1992), 63 Ohio St.3d 84, 94; Marshall v.Aaron (1984), 15 Ohio St.3d 48, 51 (stating that Ohio courts may not suasponte grant summary judgment in favor of the nonmovant).
Regarding the language in the exhibit relative to the minutes of the committee meeting, this document appears to have been submitted by the employees rather than the corporation whose affidavits basically refer to it as being something they would use at trial to bolster their claims. Moreover, the employees claim that the word "distributable" means that although dividends are not currently payable, they are to be reinvested as permitted under Section 6(b)(ii) and then paid upon subsequent vesting. How the funds from operation is calculated with regards to the disputed clause in the exhibit to the minutes may be a topic appropriately determined after hearing testimony at trial.
Most importantly, minutes are notes made by one individual about what occurred at a meeting. Black's Law Dictionary (6th Ed. Abr. 1991) 690. Neither of the affiants were the individual who made these notes. See Civ.R. 56(E) (requiring papers referred to in an affidavit to be sworn or certified and attached or served with the affidavit). Additionally, the affidavits only referred to exhibits to the minutes, which are even further removed from the issue of what was decided at the meeting. Furthermore, the minutes were not the substance of the claim, or the document sued upon, as was the section of the incentive plan dealing with premerger dividends. Therefore, a court may not attempt to determine the plain meaning of the minutes.
For the foregoing reasons, this assignment of error is sustained in part; we say in part because we are not entering summary judgment for the employees on the issue of premerger dividends as they request. Rather, the trial court's summary judgment decision that premerger dividends were unwarranted is reversed and remanded for presentation of evidence on the genuine issues of material fact surrounding the committee's determination at grant. We note that contrary to the employees' calculations, if the trial court weighs the evidence in favor of the employees on the question of premerger dividends on remand, an employee can only receive those premerger dividends that were declared after they began employment and were allocated shares.
 SECOND ASSIGNMENT OF ERROR
The employees' second assignment of error alleges:
 "THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO AWARD ANTICIPATED LOST PROFIT DAMAGES TO THE PLAINTIFFS FOR SIMON'S BREACH OF THE 1994 DEBARTOLO DEFERRED STOCK PLAN."
In their motion for summary judgment and subsequent supporting memoranda, the employees argue that they are entitled to lost profit damages rather than merely the value of their allocation at the time of merger plus prejudgment interest. They state that the court can use any reasonable method to compute damages; they then cite case law on lost profits and set forth various computations the court could use to determine their lost profits. The employees basically set forth three options for computing damages: (1) the stock's highest market price reached from the time of the breach to the present multiplied by their remaining stock allocations considering postmerger dividends; (2) the initial investment of which the employees were deprived increased by the growth of a national index on the stock market since the merger; or (3) the highest market value multiplied by their allocated share value, similar to the first option, increased by the growth of the stock market since the date the stock peaked at its highest value. The employees claim entitlement to prejudgment interest on each of the three alternatives. As addressed in assignment of error number one, they also desire their original allocation to be increased by premerger dividends.
In responding to the employees' request for a summary award of damages, the corporation initially set forth arguments that encouraged the trial court to find a way around our prior decision. Finally, the corporation argued that lost profits are unavailable as a matter of law. In the alternative, the corporation alleged that the employees' calculation methods are factually unsupported and based on speculation as to how the employees would have reacted to the stock market. The corporation conceded that if each employee is entitled to their remaining allocation of shares, then the damage award should be the market value at the time of merger plus prejudgment interest.
The trial court agreed and awarded the employees an amount equal to the number of remaining allocated shares as alleged in their documentation multiplied by $16.575, which is the undisputed value of the stock on the date control of the corporation changed. The court also awarded 10% prejudgment interest.
The employees correctly note that Ohio law recognizes awards based on lost profits in various types of breach of contract actions. In these types of cases, lost profits may be recovered in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty. AGF, Inc. v. GreatLakes Heat Treating Co. (1990), 51 Ohio St.3d 177, 181; Combs Trucking,Inc. v. International Harvester Co. (1984), 12 Ohio St.3d 241, 244. Both of these cases dealt with a business's loss of profits due to the defendant's failure to provide contracted goods, e.g., a truck or a functional furnace. Id. In the case at bar, the employees were not conducting a business as in the cited cases, but they were receiving (a previously potential) benefit that was accelerated due to a change in control.
In resolving stock valuations upon failure to deliver stock, it appears that there exists competing damage theories; the conversion theory and the breach of contract theory. Scully v. U.S. WATS, Inc. (3d Cir. 2001),238 F.3d 497, 510 (dealing with an employee stock option, which carries less speculation about profit opportunities than securities to be paid outright on a date certain). Although it would seem that each theory applies depending on whether the cause of action asserted is conversion of stocks or breach of contract due to failure to deliver, courts have applied both theories to a breach of contract action. See, Id.
The breach of contract theory values the stock at the date of the breach and allows prejudgment interest. This is the valuation method used by the trial court in the case before us.
The conversion theory has also been called the New York rule.Cincinnati Finance Co. v. Booth (1924), 111 Ohio St. 361, 366. Under this theory, the plaintiff can receive the value of the stock at the time of conversion or the highest intermediate stock price between the date of conversion and a reasonable time thereafter during which the stock could have been replaced by the plaintiff. Both theories presume that the plaintiff has the ability to cover by entering the market to purchase the lost shares, if it is the shares he wants rather than the value of the shares at the time of the breach.
The conversion theory has been criticized as requiring speculation on the concept of a reasonable time during which the plaintiff must cover. It is also said to give the plaintiff the improper benefit of hindsight and has been described as "maybe too generous" and assuming "clairvoyance." See Scully, 238 F.3d at 510.
In fact, New York does not recognize this so called New York damage theory in a cause of action for breach of contract. Simon v. ElectrospaceCorp. (1971), 28 N.Y.2d 136, 269 N.E.2d 21; 320 N.Y.S.2d 225. InElectrospace, the defendant breached the contract by failing to deliver stock to the plaintiff on the date of merger, similar to the case at bar. On the date of the merger, the stock was worth $10 per share. Thereafter, the stock reached a high of $46 per share, and during trial, its average price was $34.75 per share. The court determined that the proper measure of damages, in a breach of contract action in general and in a nondelivery of shares action in particular, was the loss sustained or gain prevented at the time and place of breach. The court held that the breach was fixed in time and the amount of damages is also fixed in time corresponding to the date of the breach. See, also, Buford v.Wilmington Trust Co. (3d Cir. 1988), 841 F.2d 51, 56.
The court reasoned that plaintiff's cause of action may not be converted into carrying the benefit of a market "call" or "warrant" to acquire stock on demand if the price rose above its value. The court noted that even under the conversion theory, the plaintiff cannot receive the highest interim or trial-time value but only a value achieved by the stock within a reasonable time after the conversion. The court also noted that postmerger dividends were not part of the damage calculation because the date of the breach was the only relevant date and the plaintiff was not the owner at the time the dividends were paid.
Notably, the Ohio Supreme Court expressly refused to adopt the so-called New York rule, even in a conversion action. CincinnatiFinance, 111 Ohio St. at 366. In that case, the defendant wrongfully refused to transfer stock to the rightful owner. Thus, the owner sued for conversion. At the time of the refusal to transfer, the stock was worth $12 per share. A mere few days after this refusal to transfer, the stock increased in value to $14 per share. The Court held that the proper recovery as a matter of Ohio law was $12 per share, which was the market value of the stock on the day that the defendant failed to transfer the stock. Id. at 366-367. The Court also allowed the plaintiff to recover dividends that were declared and payable prior to the date of the refusal. Contrary to the employees' assertions, the Court did not allow, nor was there any issue of, dividends declared after the refusal to transfer. The Court also awarded interest from the date of the defendant's refusal to transfer.
The employees argue that Cincinnati Finance is no longer of precedential value because it was decided before Ohio expressly stated that lost profits may be recovered for breach of contract if the tripartite Combs test is met. However, we disagree. We do not believe that Cincinnati Finance has been implicitly overruled. The lost profit cases are distinguishable. This case involves individual plaintiffs who claim[2] that, due to the defendant's failure to issue stock upon a change in corporate control, they were each precluded from having the opportunity to reap any gains that occurred with regards to this particular stock and with regards to the stock market in general. The lost profits cases dealt with loss to a business and noted that the loss to the business existed regardless of whether the breach was later remedied as it was set in time.
Moreover, even assuming a conversion theory was applicable, the employees set forth stock and market values that clearly occurred outside "a reasonable time after the failure to deliver the stock." The stock was to be transferred on the date that corporate control changed, in August 1996. The employees' recovery theories choose the stock's high reached in April 1998 to compute damages, more than one and one half years after the merger. Another of their theories, takes the growth of the market up to the date of their July 2000 memorandum. Both of these dates are remote in time from the date of the breach, and damages based on these market values utilize hindsight and speculate how an employee would have reacted to the receipt of shares and the market. Adoption of any of the employees' recovery theories would allow plaintiffs to take advantage of a rising market and receive gains that were only realized in hindsight as the case was pending pretrial and trial, but these plaintiffs could ignore a declining market where their stock has great value on the date of merger but is worth a minimal amount after the breach.
Regardless, the employees conceded before the trial court that the damage calculations were speculative. They even mentioned that, had the defendant issued the stock on the date of the merger, the employees may have received their award and gambled it away. Furthermore, the employees argue that only the existence of lost profits, not the amount, must be proven with reasonable certainty. However, the Ohio Supreme Court has specifically stated that "both the existence and the amount of lost profit must be demonstrated with reasonable certainty." AGF,51 Ohio St.3d at 183, citing Gahanna v. Eastgate Prop., Inc. (1988), 36 Ohio St.3d 65.
In cases such as this, the award of prejudgment interest serves to compensate the aggrieved parties for losses incurred by the failure to issue the shares. See Royal Elec. Constr. Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110, 116 (mentioning a common law right to prejudgment interest in a breach of contract case as part of compensatory damages, regardless of the statutory right to prejudgment interest). Various commentators and courts opine that this prejudgment interest award can also compensate the plaintiff for financing charges incurred if he purchased the stock as cover. Additionally, we find support for the damage award calculation in the Ohio Supreme Court's case of Worrell v.Multipress, Inc. (1989), 45 Ohio St.3d 241.
In that case, the plaintiff sued for breach of contract to convey stock. Because the stock was not traded on the public market, the Court stated that the value is what a willing buyer would have paid a willing seller. The relevant time period was at the time of breach, not at a later date. Although the Court found that prejudgment interest was not warranted because the value of the stock at the time of breach was uncertain, the following statement by the Court is illuminating:
 "Prejudgment interest is not available pursuant to R.C. 1343.03(A) unless there is an amount due and payable, or a claimed amount due is capable of ascertainment by computation or reference to well-established market values at the time the cause of action arose." Id. at 249 (emphasis added).[3]
This case directed courts to establish market values of stock at the time of the breach even though the law of lost profits in Ohio had been set forth years earlier.
In conclusion, the trial court did not err in awarding damages to the employees' as a matter of law and calculating these damages by multiplying the undisputed market value at the time of breach by the undisputed original allocation (from which the court had already subtracted the earned shares already received by the employees from the corporation at the date of the merger). We note that this holding relates to the damages calculation method and that there still remains that issue of premerger dividends as set forth in the employees' first assignment of error.
 THIRD ASSIGNMENT OF ERROR
The employees' third assignment of error alleges:
 "THE TRIAL COURT IGNORED THE EXPRESS LANGUAGE OF THE SIMON SEVERANCE PROGRAM AND ERRONEOUSLY CONCLUDED THAT SIMON WAS ENTITLED TO A SETOFF AGAINST THE DAMAGES AWARDED TO PLAINTIFFS, PETERS AND FERGUSON UNDER THE 1994 DEBARTOLO DEFERRED STOCK PLAN."
Various employees who stayed through the actual merger received benefits under a severance program immediately after their termination. Norman Peters and Robert Ferguson, the only employees presently at issue under this assignment of error, appear to be two of the most highly compensated employees. At the time they received their severance benefits, they had already been paid their unvested, earned shares pursuant to the corporation's interpretation of the incentive plan after the change in control of the corporation. Upon this court's prior decision, all allocated shares were ordered paid to the employees. As such, the corporation claims that severance payments should not have been paid to Peters and Ferguson due to a clause in the severance program dealing with maximum benefits.
The severance program arose pursuant to the March 1996 Agreement and Plan of Merger. Section 5.12(c) of this agreement required DeBartolo to implement the severance program by the effective date of the merger and to ensure it is maintained by its successors. This severance program provides benefits to employees who are terminated without cause or who resign for good reason within the two-year period following the effective date of the merger. See Severance Program Sections 1.9, 1.10, 1.11, and 2.1. The types and amounts of severance benefits are listed under Section 2.1. However, Section 2.2 provides:
 "2.2. Maximum Benefits: Anything in Section 2.1 to the contrary notwithstanding, payments under Section 2.1 shall not exceed the maximum amount which can be paid to an Eligible Employee without causing such payments to be treated as `parachute payments' for the purposes of Section 280G of the Code (determined by taking into account all payments made to the Eligible Employee under any other plan or arrangement that are taken into account for purposes of Section 280G)."
Section 1.5 of the severance program states that the "Code" refers to the Internal Revenue Code.
As relevant to the case at bar, Section 280G of the Internal Revenue Code, defines a parachute payment as any payment to a highly compensated individual if such payment is contingent on a change in control of the corporation and the aggregate value of the payments equals or exceeds a certain amount. 26 U.S.C. § 280G (b)(2)(A)(I)(I),(ii), and (c). The certain amount is three times the base amount. The base amount is an individual's annualized compensation for the base period, which is the most recent five taxable years ending before the date on which the change in control occurs. 26 U.S.C. § 280G(b)(3) and (d)(2). We note that parachute payments are permitted under the Code, but they are not deductible as expenses of the corporation and are subject to a nondeductible 20% excise tax which is imposed upon the individual. See26 U.S.C. § 4999.
In its second counterclaim, the corporation alleged that if the employees recover allocated but unearned shares under the incentive plan, then Peters and Ferguson were not permitted to receive payments under the severance program because these severance payments would be treated as parachute payments under Section 280G of the Code. Such treatment would require the refusal of benefits under the severance program. The corporation notes that the employees do not dispute that their award of allocated but unearned shares under the incentive plan was contingent on a change in control and is considered in determining if a parachute payment existed. The corporation contends that the severance payments were also contingent on a change in control and, thus, the payments must be considered in determining whether a parachute payment exists under Section 280G. The corporation concludes that due to the large amount received by these two employees under the incentive plan, their severance payments constituted parachute payments and should not have been paid under the severance program. The remedy sought by the corporation is an offset of the severance payments received by the two employees from their damage award under the incentive plan. We note that although this argument was only specifically levied against the two aforementioned individuals, it was reserved against any other employee whose payments may fit the scenario.
The magistrate granted summary judgment for the corporation on its second counterclaim and thus allowed the offset. The trial court overruled the employees' objections and granted judgment in accordance with the magistrate's decision. The employees' only contention is that the severance payments were not parachute payments because they were not contingent on a change in control. Hence, the sole issue presented on appeal regarding the second counterclaim and this assignment of error is whether the payments made under the severance program can be characterized as "contingent on a change in control."
The employees focus on the fact that the severance program could not actually be utilized until the date of the merger, since it dealt with terminations that occurred after the merger and could be revoked before the merger date. Because the program was not actually usable until after the merger, the employees reason that the severance payments were not conditioned on a change in control and that Section 280G would thus not apply.
The corporation insists that Section 280(G) is applicable because the severance program was enacted prior to the date of the merger and was entitled "Severance Program of DeBartolo Realty Corporation and DeBartolo Properties Management, Inc." The corporation states that the merger agreement of March 1996, prior to the change in control, established the severance program. They also point to letters pertaining to the severance program that were sent to employees more than two months before the merger.
The corporation cites Proposed Regulation 1.280G-1, QA 22(b), which states that a payment is contingent on a change in control if: (1) the payment is contingent on an event that is closely associated with a change in control, (2) a change in control actually occurs, and (3) the event is materially related to the change in control. This proposed regulation also explains that voluntary or involuntary termination would constitute an event that is closely associated with a change in control and that this event would be materially related to the change in control if it occurred within one year after that change. As such, a payment made due to this termination is included in the parachute calculation.
The employees cite to Proposed Regulation 1.280(G)-1, QA 23, which appears to contain an exception to QA 22. This proposal provides that payments are not treated as contingent on a change in ownership or control if they are made pursuant to an employment agreement entered into between the employee and the new employer after the change in control has occurred. We note that these citations are to "proposed regulations," which were proposed in 1989 but have not been adopted.
 ANALYSIS
"Golden parachutes" have been defined as "agreements between a corporation and its top officers which guarantee those officers continued employment, payment of a lump sum, or other benefits in the event of a change in corporate ownership." Worth v. Huntington Bancshares, Inc. (1989), 43 Ohio St.3d 192, 196. They are principally used as a defense against hostile takeovers; they are also used to attract competent personnel and promote objectivity by ensuring financial security. Id. In these scenarios, the corporation is purposefully providing for the payments of parachute payments regardless of the effects. There exists much criticism of the use of golden parachutes to benefit executives at the expense of shareholders. Id. at 196-197 (citing various law review articles). In a statute entitled, "Golden parachute payments," the Internal Revenue Code sets forth a formula for calculating a parachute payment. 26 U.S.C. § 280G. As aforementioned, it then heavily taxes any payments over the amount established by the formula and excludes these payments from corporate deductions. 26 U.S.C. § 4999.
In the case before us, the severance program explicitly stated that parachute payments were not to be created from the funds of that program. The amounts paid under other plans that are included in the parachute calculation determine whether severance payments would result in amounts over the parachute limit in the Code. The existence of the anti-parachute payment clause in the severance program demonstrates that severance payments paid as a result of the merger and a closely associated termination are included in the calculation of a parachute payment. As per the examples from the proposed regulations cited by the parties and the legislative history, if an agreement exists to pay money upon a change in control, the control changes, and the individual is paid, then this payment is included in the parachute calculation. Additionally, if an agreement provides for severance pay upon termination, control changes, the party is soon thereafter terminated, and severance is paid, then this payment is included in the parachute calculation. See H.R. Conf. Rep. 98-369 p. 849-852, reprinted in U.S.C.C.A.N. 1145, 1537-1540. In the case at bar, we have a corporation's program which makes severance benefits contingent on a pending change in control plus termination soon after the change (and which caps or eliminates the severance payments if all payments to an individual under all plans result in a golden parachute).
Although the employees concede that there need not exist a formal contract regarding the payments prior to the change in control, they claim that the severance program could be canceled before the merger and, thus, it was not an agreement or understanding that existed until after the merger took place. However, the severance program was specifically adopted in anticipation of the merger; it was required to be maintained by the merger agreement. The merger agreement mandated that the program exist at the time of merger and obligated DeBartolo to force entities in place after a change in control to abide by its terms. For this to happen, the severance program must be in place prior to a change in control.
Regardless, the program could not be revoked by the entity which was to take control. An employee could hold the new entity to the program as long as that employee was still there at the time of the merger. Hence, the example presented by the employees, where an employment agreement with a severance package was entered between an employee and the new corporation after the merger, is inapplicable.
In conclusion, if an employee left the employ of the company before the merger, he would not receive payment under the severance program. If an employee left three years after the merger, he would not receive payment under the severance program. If the merger did not occur for some reason, then employees would not receive severance payments under the program upon termination of employment. The payments to the employees in this case occurred due to termination of employment within months of the merger and were contingent upon a change in control.
At the time of payment, the severance benefits did not place the employees over the limit in the Code's parachute calculation because they had only received earned but unvested stock under the incentive plan. Due to court-ordered acceleration of unearned stock, which is included in the parachute calculation, the severance payments are parachute payments which should never have been received. Accordingly, the corporation is entitled to set off in the amount of the severance benefits paid to the employees whose severance benefits would be considered parachute payments due to the parachute calculation which incorporates amounts paid under the incentive stock plan. The trial court's judgment on this issue is affirmed.
 FOURTH ASSIGNMENT OF ERROR
The employees' fourth assignment of error alleges:
 "THE TRIAL COURT ERRED IN DETERMINING AS A MATTER OF LAW THAT RON TAYLOR WAS AWARDED 3,000 SHARES WHEN THERE WAS EVIDENCE IN THE RECORD PROVING THAT HE HAD BEEN AWARDED 12,000 SHARES."
Due to the admissions of the corporation, the trial court determined that each employee was entitled to the number of shares listed in their 1997 motion for summary judgment with the exception of Ron Taylor. The employees claimed that Taylor was allocated 12,000 shares and was currently owed 10,800 shares. The court noted that he was originally allocated 3,000 shares and that he earned 10% of the original allocation after the corporation met its 1994 goal. The court thus awarded Taylor 2,700 shares, finding that no evidence showed that he was entitled to more.
 ANALYSIS
Contrary to the trial court's assertion, evidence was presented to support the claim that Ron Taylor was entitled to 12,000 shares of stock. In response to the employees' 1997 request for admissions, the corporation stated that, from a reasonable inquiry, it could neither admit nor deny that Taylor had been awarded 12,000 shares of stock. In June 2000, the employees submitted the affidavit of Norman Peters, Senior Vice President of Leasing for DeBartolo. This affidavit stated that in March 1995, Richard Sokolov, CEO, agreed that Taylor's shares would increase to 12,000 shares. Attached to and incorporated in the affidavit was a memorandum issued on March 27, 1995 by Peters to Irving Kravitz, Vice President of Human Resources, instructing him to increase Taylor's shares to 12,000.
In July 2000, the corporation submitted the affidavit of Kravitz who insisted that Taylor was only awarded 300 shares from 3,000 potential shares. In support, he pointed to an attached letter issued to Taylor on March 22, 1995, and an acknowledgment signed by Taylor on April 4, 1995, referring to the fact that because the company met its 1994 goals, Taylor would earn 300 shares or 10% of his original allocation.
The employees argue on appeal that the court's judgment that Taylor was only allocated 3,000 shares is erroneous as there exists a genuine issue of material fact regarding Taylor's allocation. The corporation does not respond to this assignment of error. As can be seen from the aforementioned conflicting affidavits, there exists a genuine issue as to whether Taylor was allocated more shares in the spring of 1995. The court was not permitted to disbelieve the affidavit of Peters as a matter of law. Therefore, the employees' request for a trial on Taylor's allocation is with merit and, thus, this assignment of error is sustained.
 CROSS-APPEAL BY CORPORATION, CASE NO. 01CA10
We now turn to the corporation's appeal. The corporation sets forth four assignments of error on cross-appeal. The first three assignments revolve around the court's refusal to permit discovery on various topics to establish genuine issues of material facts. Thus, these three assignments will be addressed together. The fourth assignment of error deals with allegations of double recovery.
 FIRST, SECOND AND THIRD ASSIGNMENTS OF ERROR
The corporation's first three assignments of error contend:
 "THE TRIAL COURT ERRED IN DENYING FURTHER DISCOVERY ON REMAND."
 "GENUINE ISSUES OF MATERIAL FACT EXIST AS TO THE AMOUNT, TIMING AND EXISTENCE OF OUTSTANDING DEFERRED STOCK AWARDS."
 "THE TRIAL COURT IMPROPERLY RULED ON COUNT ONE OF THE COUNTERCLAIM WITHOUT ALLOWING DISCOVERY ON PLAINTIFFS' WAIVER DEFENSE."
Upon remand, the trial court limited discovery in two respects. First, it determined that the corporation was not permitted to further discover information pertaining to the number and nature of the shares to which the employees claimed entitlement. Second, the trial court did not permit discovery on information regarding the possible fraudulent nondisclosure on the part of the employees.
 ANALYSIS REGARDING NUMBER AND NATURE OF SHARES
Due to this court's prior opinion which stated that the employees were entitled to vesting of all shares originally allocated by the committee regardless of whether they had been earned, the trial court properly pronounced that discovery was not permissible on the nature of the shares. As to the corporation's complaint that it was entitled to discovery on the amount of shares to which each employee was entitled, the corporation points out that we mentioned that extrinsic documentation may be subsequently useful in determining how many shares are owed to each participant. In our prior decision, we were addressing the plain language of the pertinent section of the incentive plan. Accordingly, we did not look to extrinsic documentation which the corporation alleged supported its claim that it did not intend to award the shares until they were earned. We were not addressing specific amounts and damages. Our reference to extrinsic documentation was dicta which noted that such may be necessary to determine the amount of the allocations. If the parties did not dispute the amount of the allocations, then there is nothing left to discover on this issue.
In 1997, the employees submitted requests for admissions to the corporation. They asked the corporation to admit the number of shares respectively awarded to each employee. The corporation admitted that the same number of shares was allocated to each employee as the employees alleged.[4] The corporation denied that this number represented anaward and stated that the awarded shares were only those earned as a result of meeting 1994 financial goals. From these admissions and our prior decision on the law, the trial court was able to ascertain the number of shares originally allocated to each employee. Besides subtracting any shares already paid to the employees by the corporation from their original allocation, said payment being undisputed, there were no genuine issues of material fact left for the trial court to determine or for the corporation to discover regarding the amount of shares allocated. As such, this argument is without merit.
 ANALYSIS REGARDING RELEASE OF CLAIMS
As for the corporation's argument that the trial court erred in refusing to allow further discovery on the allegations of its waiver and the employees' fraudulent nondisclosure, we find that discovery was unwarranted. As previously noted, the first count of the corporation's counterclaim alleged that the employees' failed to sign a release of claims after receiving payment under the severance program. The severance program was attached to the counterclaim. Both sides moved for summary judgment on this counterclaim. The corporation admitted that it did not ask the employees to sign releases before or at the time the corporation paid the benefits. From this admission and the plain language of the severance program, the employees opined that the corporation waived its right to condition payment on a signed release. The corporation believed that the employees' acts of receiving severance payments without informing the company that they might sue for their remaining allocated shares constituted fraudulent concealment.
The trial court held that it would not permit discovery concerning fraudulent nondisclosure as neither side alleged fraud in their pleadings. The court then upheld the plain language of the severance program. On appeal, the corporation argues that it was entitled to discovery due to the employees' reference to the issue of waiver. They claim that they could not waive the signing of a release unless they knew that the employees intended to sue them.
This argument is without merit. The corporation did not counterclaim for fraud, they counterclaimed for breach of the terms of the severance program due to the failure to sign a release. Additionally, the trial court's decision was rendered on the plain language of the severance program. The severance program states that severance payments "may, at the time of payment, be conditioned upon" the signing of a release of claims. The magistrate and the trial court correctly stated that the right to condition severance payments on release forms only existed at the time of making severance payments, not after payments were already made. Notably, the corporation does not argue that the trial court incorrectly determined the plain language of the severance program with regards to the signing of the release. This leads us into the corporation's next allegation of error.
 FOURTH ASSIGNMENT OF ERROR
The corporation's fourth and final assignment of error alleges:
 "PLAINTIFFS ARE NOT ENTITLED TO DOUBLE RECOVERY FOR SHARES RECEIVED UNDER THE SEVERANCE PROGRAM."
As aforementioned, certain employees received benefits under the severance program. For instance, stock "stay bonuses" were paid to certain employees who stayed until the merger was complete. Cash was then paid to these employees when they were terminated soon after the merger. The corporation claims that the 15% of each employee's stock allocation that was available for earning in 1995, but which was never earned due to failure to meet financial goals that year, is the source of the "stay bonus" paid to the employees under the severance program. Thus, they claim that 15% of the original stock allocation under the incentive plan was already paid to the employees as stock stay bonuses under the severance program.
As previously explained, the corporation's first counterclaim sought return of severance benefits paid to employees who refused to sign a release of claims after they had received the benefits. In their motion for summary judgment on that counterclaim, the corporation first mentioned their theory that the employees seek double-recovery of stock. They did not raise partial payment as a defense in their answer or amended answer.
The employees insist that the shares awarded as stay bonuses under the severance program were not the same shares that were originally allocated under the stock incentive plan. They explain that the corporation merely used figures from the incentive plan allocations as a basis to determine how many shares an employee should receive as a stay bonus. The employees argue that, once control changed, their allocated shares vested under the incentive plan. Subsequently, those who stayed after the merger, provided additional consideration for the stay bonuses that became payable under the severance program.
 ANALYSIS
The corporation first mentioned their double recovery theory in a motion for summary judgment dealing with a wholly different aspect of the severance program. In denying their summary judgment motion, the magistrate mentioned the theory but did not make a decision on it. As such, the objections to the magistrate's decision did not mention the theory. Rather, the corporation raised it to the trial court in a post-remand brief in opposition to the employees' motion for summary judgment on the issue of damages. Initially, we note that the affirmative defense of payment must be raised in the defendant's answer or it is waived. Civ.R. 8(C); Civ.R. 12(G). The defense of partial payment has been treated similarly. Blackwell v. International Union, UAW Local No.1250 (1984), 21 Ohio App.3d 110, 111. Nonetheless, because the employees did not and do not allege that the corporation waived the double recovery theory, we shall proceed.
The March 1996 merger agreement stated that the severance program shall be enacted so that certain employees will be encouraged to remain after the consummation of the merger. The document actually conferring the right to severance payments upon the employees is the severance program itself. Section 5.8 of the severance program specifically provides:
 "Benefits payable to an Eligible Employee under this Program shall not be taken into account for purposes of determining such Eligible Employee's entitlement to, or amount of, benefits under any other employee benefit plan or arrangement of the DRC Companies or the Simon Companies." (Emphasis added).
A plain reading of this section indicates that receipt of benefits under the severance program does not affect the amount an employee is entitled to receive under another corporate plan.[5] Thus, the stock stay bonuses could not be utilized to diminish the right to allocated shares under the incentive program. As such, the corporation's second assignment of error is overruled.
 CONCLUSION
For the foregoing reasons, the judgment of the trial court is hereby affirmed in part, reversed in part and remanded. Specifically, the employees' first assignment of error, dealing with premerger dividends, is sustained in part and the issue is remanded for a trial. Additionally, the employees' fourth assignment of error, dealing with the amount of shares allocated to Ronald Taylor, is sustained and remanded for trial. All other assignments are overruled.
Donofrio, J., concurs.
DeGenaro, J., concurs.
[1] Although we previously chastised the employees' in their first appeal, once again, their brief does not expressly set forth assignments of error as required by App.R. 16(A). They do, however, separate their argument into headings, some of which can be construed as assignments of error since they contend that the trial court erred.
[2] We should point out that the employees' depositions were not filed until after the trial court released its judgment entry. Thus, their contents were not before the trial court and therefore have not been considered by this court.
[3] Although Royal Electric subsequently held that prejudgment interest is recoverable regardless of whether the claimed amount due is capable of ascertainment, the fact that the Court directed the parties to market values at the time the cause of action arose is significant in this breach of contract action for failure to deliver stock.
[4] This analysis does not apply to employee Ronald Taylor. The issues surrounding his claims were addressed supra in the employees' fourth assignment of error. Due to our resolution of that assignment of error, it follows that discovery is permissible on his claim that 12,000 rather than 3,000 shares were allocated to him.
[5] This provision did not serve to assist Peters and Ferguson in the employees' third assignment of error. Section 5.8 only precludes the consideration of severance payments in determining the proper amount of benefits payable under other plans. It does not preclude the consideration of payments made under other plans in determining the proper amount of severance pay as is permitted under Section 2.2 to cap the severance benefits. In other words, severance benefits cannot decrease other benefits, but other benefits could potentially decrease severance benefits.